IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUDITH M. SHERMAN, )
)
Plaintiff, )
) Civil Action No. 07-306 Erie
)
v. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

      Plaintiff, Judith M. Sherman, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Sherman filed applications for DIB and SSI on June 29, 2004, alleging disability since May 20, 2000 due to arthritis, degenerative disc disease, herniated discs and numbing in her legs (Administrative Record, hereinafter "AR", 60-64; 71; 544-546). Her applications were denied and she requested a hearing before an administrative law judge ("ALJ") (AR 40-45; 548A-548E). A hearing was held before an administrative law judge ("ALJ") on August 30, 2006 and following this hearing, the ALJ found that Sherman was not entitled to a period of disability, DIB or SSI under the Act (AR 22-28; 561-585. Her request for review by the Appeals Council was denied (AR 6-9), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny both motions and the matter will be remanded to the Commissioner for further proceedings.

### I. BACKGROUND

      Sherman was born on November 20, 1958, and was forty-eight years old on the date of the ALJ's decision (AR 27; 60). She has a high school education and past relevant work experience as a school crossing guard and home health aide (AR 72-73; 79). She lives in an

1

apartment with her young daughter (AR 97). One month prior to her alleged disability onset date, Sherman was seen by Donald B. Smith, M.D. on April 25, 2000 for complaints of right knee pain radiating down her leg and into her right foot (AR 127). Dr. Smith reported a negative straight leg raise bilaterally, with no pain on internal or external rotation over her lower extremities (AR 127). Pain was noted along her right medial joint line in her knee but she exhibited good range of motion (AR 127). X-rays of Sherman's lumbar spine showed grade I spondylolisthesis at L5-S1 and x-rays of her knee were unremarkable (AR 127). Dr. Smith recommended an MRI of her knee to rule out a medial meniscal tear and instructed her in back extension exercises (AR 127).

Medical records from Northwest Eye Associates from June 2, 2000 through July 19, 2002 show that Sherman was treated by Roger Virgile, M.D. for recurrent corneal erosions (AR 129-166). Dr. Virgile reported normal findings in 2002 and found no limitations in her ability to perform work-related physical activities (AR 130-133).

Sherman was treated by Roberta Kahler, M.D., an internal medicine specialist, for a variety of complaints (AR 515). In November 2001, Sherman was diagnosed with a pulmonary embolism and when seen by Dr. Kahler for follow up, her lungs were clear. (AR 319; 331; 401-405; 408). A venous sonogram of Sherman's left leg dated November 6, 2001 was negative (AR 397). Lower lumbar studies conducted November 9, 2001 showed bilateral spondylolysis at L5 with degenerative changes in the lower lumbar spine (AR 396). For her complaints of back pain, Dr. Kahler prescribed Tylenol with Codeine (AR 315-316). Chest x-rays conducted November 12, 2001 showed poor inspiration with persistent or recurrent bibasilar atelectasis, but two weeks later x-rays showed improvement (AR 393-394). On November 28, 2001 a right lower extremity venous ultrasound was negative (AR 390). On December 12, 2001, Sherman requested "something for her nerves" and Dr. Kahler prescribed Ativan (AR 317).

Sherman was seen by several physicians at Cancer Care Specialists. When seen by Sajid Peracha, M.D. on December 18, 2001, Dr. Peracha reported that she suffered from severe back pain secondary to spondylolisthesis (AR 181). On physical examination Sherman exhibited tenderness where the spondylolisthesis was located (AR 181).

On January 2, 2002 Sherman reportedly still had back pain but was getting better (AR

330). She denied any other problems (AR 330). On physical examination, mild tenderness was noted in the lower lumbar area (AR 330). She was diagnosed with hypercoagulable state, cause unknown, bilateral persistent pulmonary infiltrate and elevated lupus anticoagulant (AR 330).

Sherman was seen by Dixie Harris, M.D. on January 3, 2002 for evaluation of an abnormal chest x-ray (AR 331-332). She complained of occasional shortness of breath but reported overall improvement (AR 331). On physical examination, Dr. Harris reported she was obese but otherwise well-appearing and in no acute distress (AR 331). Her physical examination was essentially unremarkable and Dr. Harris recommended that she continue her medication regime (AR 331-332).

Chest x-rays conducted January 9, 2002 showed areas of pleural and parenchymal scar with no acute process, pleural effusion or mass disease identified (AR 387). A lung scan conducted the same date showed partial re-expansion of the bibasilar atelectasis (AR 388).

On January 22, 2002, Dr. Kahler prescribed Soma and Vicodin when Sherman complained the Tylenol was ineffective (AR 315).

When seen by Bakhti Sinor, M.D. from Cancer Care Specialists on January 29, 2002, Sherman reported she was gaining weight, her body hurt, her feet cramped up, her toes tingled and she suffered from severe low back pain (AR 325). She claimed she was unable to bend or stoop, had extreme difficulty getting out of bed and suffered shortness of breath and fatigue (AR 325). Dr. Sinor reported that she was obese, her condition was fair and she exhibited no paravertebral spasm or tenderness on physical examination (AR 326). Dr. Sinor diagnosed her with multiple pulmonary embolism, rule out the possibility of lupus (AR 326). He recommended that she lose weight and prescribed a chair lift (AR 326).

An MRI of Sherman's lumbar spine conducted on February 12, 2002 showed disc and end plate degenerative changes of varying degrees from L1-2 through L4-5 with end plate spurring and resulting mild bilateral foraminal narrowing (AR 386). Sherman also had bilateral spondylolysis with grade II spondylolisthesis at L5-S1 with disc bulging, which produced marked bilateral foraminal narrowing (AR 386). There was a migrated free disc fragment or synovial cyst which did not produce a significant mass effect upon the thecal sac (AR 386). There was moderate central stenosis at L2-3 from disc bulging and end plate degenerative changes as well

as prominent epidural fat and ligamentum flavum hypertrophy (AR 386).

When seen by Dr. Peracha on February 15, 2002 Sherman complained of back pain (AR 176). When seen by Dr. Harris for follow up on February 21, 2002, Dr. Harris reported she was "actually doing quite well" (AR 322).

On April 25, 2002, Sherman was seen by Dr. Sinor and reported that she felt "fair" and had twinges "now and then" in her chest wall and rib cage (AR 172). She denied any shortness of breath but complained of right thigh and groin pain (AR 173).

Sherman returned to Dr. Sinor on June 7, 2002 and had a persistent cough of unknown etiology (AR 172). She refused to have her weight checked and her remaining physical examination was unremarkable (AR 172).

A venous ultrasound of Sherman's left leg dated September 11, 2002 was reported as normal with no evidence of deep vein thrombosis identified (AR 383).

When seen by Dr. Peracha relative to her hematological problems on November 19, 2002, he noted Sherman had multiple problems including muscle problems (AR 169). He further noted that she was on Naproxen for her back pain and that overall her pain was under better control, but she was not completely asymptomatic (AR 169). Her physical examination was unremarkable (AR 169).

Chest x-rays dated January 9, 2003 showed left basilar scarring with no pleural effusion or acute process seen (AR 382).

On May 21, 2003, when seen by Dr. Kahler, Sherman complained of chest pain, leg cramping and vision changes in her eyes (AR 311).

Sherman was also treated by Donna Anderson, M.D., an internal medicine specialist (AR 476-513). On February 27, 2004 she reported a cough and swelling in her legs bilaterally with associated toe cramping (AR 484). Dr. Anderson's physical examination was within normal limits, there was no focal neurological deficits and Sherman's gait was within normal limits (AR 484). She was assessed with bronchitis and prescribed medication (AR 484).

When seen by Dr. Anderson on May 12, 2004, Sherman complained of numbness in her legs down to her knees and dizziness upon standing (AR 482). On physical examination, Dr. Anderson reported that Sherman had no focal neurological deficit, her sensation to soft touch in

4

her left foot was decreased, her motor strength was 5/5, her deep tendon reflexes were 2/5, and she had decreased flexion and extension secondary to pain (AR 482). She was diagnosed with lumbar disc disease and cord impingement, as well as right leg cramping (AR 482). Dr. Anderson ordered diagnostic studies and prescribed Lisinopril, Tylenol #3, Naprosyn and Skelaxin (AR 482).

An MRI of Sherman's spine conducted on May 14, 2004 showed chronic degenerative disc disease with significant progression of the end plate inflammatory changes, which appeared to be acute about the L2-3 and L5-S1 discs (AR 498). There was a small central herniation of the L1-2 disc and a left paracentral herniation of the L2-3 disc, however, these herniations did not appear to contribute to any central or foraminal stenosis (AR 498-499). There was spondylolysis of the pars interarticularis of L5 with a grade II spondylolisthesis at L5-S1, which resulted in severe foraminal stenosis at L5-S1 level that appeared unchanged since the prior MRI study of February 12, 2002 (AR 499).

Sherman returned to Dr. Anderson on June 28, 2004 complaining of back and leg pain, numbness and parasthesia in both hands and legs (AR 481). On physical examination, Sherman weighed 293 pounds, had decreased sensation in her left foot and decreased flexion and extension secondary to lumbar pain (AR 481). She was diagnosed with lumbar disc disease and cord impingement; chronic degenerative disc disease with significant progression of end plate inflammatory changes, acute at the L2-3 and L5-S1 levels; central herniation at L1-2 and L2-3 with no stenosis; severe foraminal stenosis at L5-S1; and peripheral neuropathy of the upper extremities (AR 481).

On July 14, 2004, a bilateral upper and lower extremity nerve conduction EMG study was reported as abnormal with findings suggestive of chronic proximal L5-S1 pathway involvement in both lower extremities (AR 497). In light of the associated abnormalities at the paraspinal level, localization appeared to be at the root level, but clinical correlation was recommended (AR 497).

Sherman returned to Dr. Anderson on July 28, 2004 still complaining of numbness (AR 480). Dr. Anderson diagnosed peripheral neuropathy of her wrists, which was greater on the right than on the left (AR 480.

An MRI of the cervical spine dated July 30, 2004 showed diffuse degenerative disc disease which had progressed since the prior study dated August 6, 1996 (AR 491). There was disc bulging at all levels but no significant facet degenerative change was seen (AR 491).

On August 5, 2004, Sherman complained of constant neck pain and difficulty sleeping due to neck spasms (AR 479). She also complained of arm pain with sustained lifting and numbness in her hands (AR 479). Dr. Anderson diagnosed Sherman with degenerative disc disease of the cervical spine and prescribed NSAIDS and Skelaxin (AR 479).

Sherman underwent a disability evaluation performed by Vajayaprabba Ramanujam, M.D., an internal medicine specialist, on September 23, 2004 (AR 444-448; 516). Sherman's main complaint was low back pain which radiated down her legs causing numbness in her feet, which was exacerbated upon moving and lifting (AR 444). She claimed physical therapy provided no relief but her pain improved on lying down (AR 444). Sherman further reported arm pain, that she was unable to open her hands at times and felt "achy all over" (AR 444). She relayed her history of pulmonary embolism and recurrent corneal abrasion (AR 444). Finally, Sherman reported a history of high blood pressure, depression and intermittent chest pain, especially when anxious (AR 444; 446).

On physical examination, Dr. Ramanujam reported Sherman was obese, weighing 276 pounds (AR 446). No pedal edema or clubbing was observed in her extremities and there was no active inflammation of any of her joints (AR 446). Dr. Ramanujam reported that she had no vertebral or spinal tenderness, a straight leg raise test was negative, her deep tendon reflexes were 2+ bilaterally and her obesity did not cause any gross sensory deficits (AR 446-447). Sherman did exhibit difficulty getting off a chair and getting on and off the examination table (AR 447). Her gait was normal, her station was stable, and she was able to shake hands and perform fine and dextrous movements (AR 447).

Dr. Ramanujam diagnosed Sherman with obesity and history of low back pain, most likely secondary to degenerative arthritis and degenerative disc disease (AR 447). He completed a medical source statement of Sherman's ability to perform work-related physical activities, and opined that she could frequently lift and carry twenty pounds, stand and walk for one to two hours in an 8-hour day, and sit for four hours (AR 449). He further opined that she had an

unlimited ability to push and pull with her lower extremities; could occasionally bend, kneel, stoop, crouch, balance and climb; and had environmental limitations with respect to cold temperature extremes, wetness and humidity (AR 450).

Frank Bryan, M.D., a state agency reviewing physician, completed a residual functional capacity assessment form on October 21, 2004 and concluded that Sherman was capable of performing light work (AR 453-462). Dr. Bryan opined that Sherman could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand and/or walk for a total of at least two hours and sit for a total of six hours in an 8-hour workday; was unlimited in her push and/or pull abilities; could never climb ladders, ropes or scaffolds; and could occasionally kneel, crouch and crawl (AR 454-455). Dr. Bryan noted that Dr. Ramanujam's examination was essentially within normal limits except for Sherman's obesity (AR 461). He further noted that Sherman was able to perform most of her activities of daily living with a minimum of compromise and that her subjective complaints regarding the severity of her limitations were only partially credible (AR 462). Dr. Bryan reviewed Dr. Ramanujam's residual functional capacity assessment and disagreed with his limitations regarding sitting, temperature extremes and wetness and humidity (AR 462). He found the limitations imposed were based primarily on Sherman's representation of her physical capacity and were not supported by Dr. Ramanujam's physical examination or the medical record. (AR 462).

On October 28, 2004, Sherman complained that her arms became numb when she laid on her back and side (AR 478). She further claimed that when laying in bed, her heart fluttered and she suffered chest wall pain (AR 478). She denied any associated shortness of breath, lightheadedness or nausea (AR 478). Dr. Anderson reported Sherman had no focal neurological deficits, her motor strength was 5/5, her deep tendon reflexes were 2/4, and her gait was within normal limits (AR 478). She weighed 271 pounds and Dr. Anderson found her blood pressure was "well controlled" (AR 478).

When seen by Dr. Anderson on November 16, 2004, she complained of left knee pain and difficulty walking, as well as chest pain and a sensation of "heart fluttering" (AR 477). On physical examination, Dr. Anderson reported that she had no focal neurological deficits, her pedal pulses were intact, she had no pain on internal rotation of her knee, no effusion, no pain on

7

palpation of the joint lines and no instability pain on palpation to the ligamentous attachment below the medial joint line (AR 477). Dr. Anderson suspected she had arthritis of the knee and prescribed Naproxyn (AR 477). She also assessed her with palpitations since an event monitor showed episodes of sinus tachycardia, and started her on Atenolol (AR 477).

X-rays of Sherman's left knee on December 9, 2004 showed mild degenerative joint disease (AR 534).

In January, February and May 2005, Dr. Anderson reported Sherman had no focal neurological deficit on physical examination (AR 524-526). A stress test conducted on January 25, 2005 for complaints of chest pain and palpitations showed no evidence of ischemia and a SPECT study showed only a mildly reduced ejection fraction (AR 532-533). Dr. Anderson noted on February 1, 2005 that Sherman's stress test results were negative (AR 525).

On November 3, 2005, Sherman complained of thoracic back aches and pains, swelling and pain in her legs and an episode of lightheadedness (AR 523). Dr. Anderson found the swelling was related to her NSAID use (AR 523).

Sherman returned to Dr. Anderson on February 2, 2006 and reported that her back pain was the same or had worsened, her arms were weak at times and she suffered from pain and spasms (AR 522). Her weight was reported as 278 pounds and her blood pressure was "well controlled" (AR 522). Dr. Anderson noted that Sherman had radiating pain down her left leg, spasm to her left lumbar area and decreased flexion and no extension (AR 522). Dr. Anderson continued her diagnosis of degenerative disc disease and continued her medication regime (AR 522).

On August 1, 2006, Sherman complained of arthritis pain in her low back, knee stiffness and an irritable bowel (AR 535). She claimed it was painful when she stood for long periods of time and that she had difficulty performing household chores (AR 535). Dr. Anderson noted that her weight was 280 pounds (AR 535). On physical examination, she had no focal neurological deficits, decreased flexion and extension of her back, a negative straight leg raising test, no effusion of her knees and deep tendon reflexes of 2/4 (AR 535). Dr. Anderson diagnosed her with arthritis of the knees and back and continued her on Naprosyn and Skelaxin (AR 535).

Sherman and Fred Monaco, a vocational expert, testified at the administrative hearing

held by the ALJ on August 30, 2006 (AR 561-585). Sherman testified that she was 5'8" tall and weighed approximately 280 pounds (AR 565). She claimed the following problems prevented her from working: reoccurring corneal occlusion; chest pains; neck pain with associated arm numbness; irritable bowel syndrome; lower back pain with associated leg numbness; and feet swelling and numbness with associated tingling (AR 568). Sherman testified that Dr. Anderson prescribed Atenolol to regulate her heartbeat (AR 569). For her lower back pain she was prescribed Naprosyn and Skelaxin (AR 570). Sherman claimed an inability to lose weight as recommended by her doctor because she was unable to exercise (AR 570). She testified that although Dr. Anderson had not referred her to any specialists for treatment, she had been treated by specialists in the past (AR 569-571). Sherman testified that physical therapy aggravated her back condition and she had also undergone cervical traction at one time (AR 571).

Sherman claimed that symptoms related to her conditions interfered with her daily activities. She indicated that she was only able to engage in household chores for a very short period of time before stopping and sitting down (AR 572). She stated that her arms, hands and feet became numb and her feet tingled (AR 572). She was unable to turn her neck at times due to stiffness and had difficulty grasping or holding objects (AR 572; 574). Sherman described her back pain as if someone were twisting a knife in her back which caused her to "scream out in pain" (AR 574). Sherman testified that she suffered from these symptoms on a daily basis, as well as spasms and cramping (AR 573-575). With respect to her heart problems, she claimed she suffered from five to ten heart palpitations daily lasting five to ten minutes at a time (AR 576).

Sherman testified that she had two "good" days out of the week and that the remainder were "bad" (AR 577). On a good day she was able to perform some household chores without too many breaks and on a bad day she was unable to move at all due to lower back and leg pain (AR 577). On bad days Sherman claimed she usually sat in a chair or stood in a hot shower in an attempt to alleviate the pain (AR 578).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Sherman, who was limited to light work involving no more than four hours of standing and no more than four hours of sitting, and was restricted to air conditioned environments with no temperature extremes or excessive humidity or wetness (AR 581). The

9

vocational expert testified that such an individual could work as a document preparer, bench assembler and cashier (AR 582). The vocational expert also testified that an employer would not tolerate more than one absence per month or two to three unscheduled breaks during the day (AR 582-583).

Following the hearing, the ALJ issued a written decision which found that Sherman was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 22-28). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 6-9). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Sherman met the disability insured status requirements of the Act through June 30, 2003 (AR 22). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ found that Sherman had the following severe impairments: degenerative disc disease of the lumbar and cervical spines, degenerative arthritis affecting her neck, arms, hands, low back, legs and feet and obesity (AR 24). He determined at step three that her impairments did not meet or equal the criteria of any of the listed impairments (AR 25). The ALJ found that Sherman was able to perform work at the light exertional level with the need to avoid temperature extremes, excessive wetness and humidity (AR 25). At the final step, the ALJ concluded that Sherman could perform the jobs cited by the vocational expert at the administrative hearing (AR 19). The ALJ additionally determined that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible (AR 26). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Sherman first challenges the ALJ's residual functional capacity ("RFC") assessment. An ALJ must consider all relevant evidence when determining an individual's residual functional capacity. *See* 20 C.F.R. § 404.1545(a); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112,

11

121 (3rd Cir. 2000). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett,* 220 F.3d at 121, quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5. The ALJ made the following finding with respect to Sherman's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to 20 pounds frequently, stand and walk at least four hours per workday, and sit up to four hours per workday, needing to avoid temperature extremes, excessive wetness and humidity.

(AR 25).

Sherman argues that the ALJ erred in his evaluation of the consulting examiner's opinion in fashioning her RFC. Dr. Ramanujam, who examined Sherman pursuant to the request of the Commissioner, found that Sherman could, *inter alia*, frequently lift and carry twenty pounds, stand and walk for one to two hours in an 8-hour day and sit for four hours (AR 449). With respect to Dr. Ramanujam's opinion, the ALJ stated the following:

> As no specific assessment of physical functioning was made by the claimant's treating physician, great weight was given to the medical opinion of consultative examiner Vajayaprabba Ramanujam, M.D. to the extent that he found that the claimant could lift and carry light weight [of up] to twenty pounds and sit for up to four hours per day with the need to avoid temperature extremes, excessive wetness and humidity (Exhibit 9F). This assessment is supported by findings on consultative exam, results of medical testing, and physical findings contained in treatment notes from primary care physician Dr. Anderson.

(AR 26). Sherman contends that the ALJ failed to adequately explain his apparent rejection of Dr. Ramanujam's stand/walk limitation of one to two hours out of an 8-hour workday.

The Third Circuit has directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3rd Cir. 1979), *see also Sykes v. Apfel,* 228 F.3d 259, 266 (3rd Cir. 2000), and explain a rejection of the evidence, *see Schaudeck v. Comm'r of Social Sec. Admin.,* 181 F.3d 429, 435 (3rd Cir. 1999). "Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes,* 228 F.3d at 266 (quoting *Benton v. Bowen,* 820 F.2d 85, 88 (3rd Cir. 1987). Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris,* 642 F.2d 700, 705-07 (3rd Cir. 1981); *see also Plummer,* 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

We agree with Sherman; the ALJ did not provide an adequate explanation for his implicit rejection of Dr. Ramanujam's opinion that she could only stand/walk for one to two hours in an 8-hour workday. In order to show that a claimant is in fact capable of undertaking jobs that exist in the national economy, the Commissioner must prove that the claimant retains the residual functional capacity to work on a "regular and continuing basis." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 60 (3rd Cir. 1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3rd Cir. 1987) (citing 20 C.F.R. § 404.1545(b))). Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, defines "regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent schedule." SSR 96-8p, 1996 WL 374184 at *2.

Dr. Ramanujam's opinion that Sherman was only able to stand and/or walk for one to two hours in an 8-hour workday, combined with his opinion that she could sit for four hours, clearly limits Sherman to only five to six hours of work per day. Here, the ALJ failed to adequately explain his apparent rejection of this limitation, particularly in light of the fact that in fashioning Sherman's RFC, he accorded "great weight" to Dr. Ramanujam's opinion.

13

The Commissioner argues that, as "explained by the ALJ," Dr. Ramanujam's stand/walk restriction was not entitled to deference since it was not supported by the objective medical testing or Sherman's reported activities. *See* Defendant's Brief p. 10. The Commissioner further argues that Dr. Ramanujam's stand/walk limitation was inconsistent with the opinion of Dr. Bryan, the state agency reviewing physician, who concluded that Sherman could perform work at the light exertional level. This, however, is the *Commissioner's* explanation of the ALJ's rejection of the stand/walk restriction. We find no such explanation by the ALJ himself. Our function is to examine the adequacy of the reasons offered *by the ALJ* and not the reasons advanced by the Commissioner on appeal. *See e.g.*, *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D.Pa. 2005) ("the district court considers and reviews only those findings upon which the ALJ based his decision"); *Forsythe v. Astrue*, 2008 WL 4683436 at *4 (W.D.Pa. 2008) ("under long-standing precedent, the Commissioner cannot rectify by his own after-the-fact analysis the ALJ's failure to consider all the medical evidence of record and to explain why certain evidence was rejected or given little weight"). Based upon the above, we find that a remand is required for the ALJ to adequately address the entire opinion of Dr. Ramanujam consistent with the above standards. The ALJ is free to seek additional evidence and/or call a vocational expert is he feels it is necessary.

Sherman further challenges the ALJ's analysis at step three of the sequential evaluation process. At step three, the ALJ must determine whether the claimant's impairment matches, or is equivalent to, one of the listed impairments. *Burnett,* 220 F.2d at 119. The listings describe, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a); *Knepp v. Apfel*, 204 F.3d 78, 85 (3rd Cir. 2000). A claimant who meets or medically equals all of the criteria of a listed impairment is *per se* disabled and no further analysis is necessary. *Burnett*, 220 F.2d at 119.

Sherman argues that the ALJ erred in offering no more than a conclusory finding with

respect to whether her obesity, in combination with her other impairments, met or equaled a listing, citing *Burnett*. In *Burnett*, the ALJ's step three analysis consisted of the following discussion: "Although [Burnett] has established that she suffers from a severe musculoskeletal [impairment], said impairment failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of Social Security Regulations No. 4." *Burnett*, 220 F.3d at 119. The Third Circuit concluded that the ALJ's statement was conclusory and thus beyond meaningful judicial review, and remanded the case to the ALJ for a discussion of the evidence and an explanation of the reasoning supporting his determination. *Id*. at 119-20.

Here, the ALJ's step three analysis with respect to Sherman's obesity merely states that "[t]he combined affect of obesity with the claimant's other impairments was determined not to be of listing level severity." (AR 25). The ALJ's decision, however, is devoid of any reasons for such finding. *See Fargnoli v. Massanari*, 247 F.3d 34, 40 n.4 (3rd Cir. 2001) (noting that more than a conclusory statement that a claimant does not meet a listing is required); *Torres v. Comm'r of Soc. Sec.*, 279 Fed. Appx. 149, 152 (3rd Cir. 2008) (case remanded where no reasons were given for the ALJ's conclusion that the claimant's impairments in combination did not meet or equal a listing). Consequently, since we are unable to engage in any meaningful review of the ALJ's determination at step three, a remand is appropriate so that the ALJ can sufficiently delineate his reasons consistent with the above discussion.

Sherman's final arguments consist of a collection of random challenges to specific findings made by the ALJ which she contends are "not supported by substantial evidence." For example, Sherman argues that "[c]ontrary to the ALJ's erroneous declarations, there is categorical evidence that Sherman treated with specialists, long prior to her [date last insured], and underwent various and multiple treatment attempts, with recognition of her severe limitations." *See* Plaintiff's Brief p. 19. In support of her claim that the ALJ's finding was erroneous, Sherman recites various medical records documenting her treatment by different specialists. *See* Plaintiff's Brief p. 19. By way of further example, Sherman points out that the

ALJ inaccurately stated that she failed to submit additional evidence post-hearing. We need not resolve any of these challenges at this time since the ALJ will necessarily re-examine all the evidence on remand.

**IV. Conclusion**

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUDITH M. SHERMAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | Civil Action No. 07-306 Erie |

## **ORDER**

AND NOW, this 10th day of November, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 10] is DENIED and the Defendant's Motion for Summary Judgment [Doc. No. 14] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

 s/ Sean J. McLaughlin
 United States District Judge

cm: All parties of record.